IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERCIA | ) | |
| --- | --- | --- |
| | ) | **UNDER SEAL** |
| v. | ) | |
| | ) | Case No. 1:21-mj-276 |
| THOMAS JOSEPH MINNEHAN | ) | |
| | ) | |
| Defendant. | ) | |

AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Tre' M. Smith, Special Agent of the Drug Enforcement Administration ("DEA"), Washington Division Office ("WDO"), Washington, DC, being duly sworn, depose and state the following:

**INTRODUCTION**

1. This affidavit is being submitted in support of a criminal complaint charging THOMAS JOSEPH MINNEHAN (hereinafter, "MINNEHAN") with conspiracy to distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section, 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests.

3. I have been a Special Agent ("SA") with the DEA since April 2019. I am currently assigned to Enforcement Group Forty-two at the Washington Division Office, located in the District of Columbia. While with the DEA, I have investigated and assisted in the investigation

of many narcotics traffickers and possessors. I have previously participated in investigations which have led to the arrest and conviction of narcotics dealers and money launderers.

4. Since 2019, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover operations, operations involving cooperating sources, and a variety of other investigative tools available to law enforcement officers. In the course of my training and experience I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques, among others: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants which have led to seizures of narcotics, firearms, contraband, and drug related assets; and analysis of financial documents and records.

5. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

6. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

Confidential Sources

7. During the course of this investigation, investigators have used three (3) cooperating sources (hereinafter, "CS-1" through "CS-3"). For purposes of this affidavit, all cooperating sources will be referred to in the masculine gender regardless of their true gender. The information provided by all of the cooperating sources has been corroborated by consensually monitored telephone calls, text messages, and other means, when available. To my knowledge, none of the information provided by any cooperating sources has proved to be false, misleading, or inaccurate in any material respect.

8. CS-1 started cooperating with law enforcement in 2019. CS-1 is an admitted drug user and has convictions for, driving under the influence of alcohol, identity theft, petit larceny, probation violation, and unlawful use of a computer. CS-1 cooperated with law enforcement in hopes of consideration on a potential state drug possession charge. CS-1 has provided information to law enforcement that has been independently corroborated through law enforcement surveillance and the review of downloaded phone content. Based on the foregoing, I consider CS-1 reliable.

9. CS-2 started cooperating with law enforcement in 2020. CS-2 is an admitted drug user and has no prior criminal history. CS-2 is cooperating with law enforcement in hopes of receiving credit for cooperation on a pending local drug trafficking charge in the Arlington County. CS-2 has provided information to law enforcement that has been independently corroborated

through law enforcement surveillance and the review of downloaded phone content. Based on the foregoing, I consider CS-2 reliable.

10. CS-3 started cooperating with law enforcement in 2019. CS-3 is an admitted drug user and has no prior criminal history. CS-3 is cooperating with law enforcement in hopes of receiving credit for cooperation on a pending federal drug trafficking charge in the Eastern District of Virginia. CS-3 has provided information to law enforcement that has been independently corroborated through law enforcement surveillance and the review of downloaded phone content. Based on the foregoing, I consider CS-3 reliable.

## **PROBABLE CAUSE**

A. <u>Background of the Investigation</u>

11. In or around July 2019, law enforcement officers obtained information that MINNEHAN was distributing quantities of methamphetamine throughout the Northern Virginia region. In the Fall of 2020, MINNEHAN was observed moving into the address of 506 South 24th Street, Arlington, Virginia (hereinafter, "SUSPECT RESIDENCE-1"), which is located within the Eastern District of Virginia.

B. <u>Historical Information provided by CS-1</u>

12. On or about July 2019, law enforcement located a wanted subject at his apartment in Arlington County, Virginia. Small quantities of suspected crystal methamphetamine and Gamma-Hydroxybutyric acid (GHB) were located in that subject's residence during a consent search. The subject—CS-1—agreed to cooperate with law enforcement in hopes of consideration on a possible drug possession charge. During an interview, CS-1 admitted to being supplied with quantities of crystal methamphetamine by MINNEHAN.

C. Controlled purchase of methamphetamine on July 30, 2019

13. On or about July 30, 2019, under the direction and supervision of law enforcement, CS-1 made a controlled purchase of a quantity of suspected crystal methamphetamine from MINNEHAN in Arlington, Virginia, within the Eastern District of Virginia. CS-1 arranged this purchase by communicating with MINNEHAN via his cell phone. Prior to, and following, the controlled purchase, CS-1 was searched for contraband and currency with negative results. Law enforcement conducted surveillance of the arranged meeting location. CS-1 met with MINNEHAN inside of the MINNEHAN'S vehicle to conduct the transaction. According to CS-1, MINNEHAN provided him with the methamphetamine which was subsequently turned over to law enforcement. This controlled purchase was observed by law enforcement and monitored via a listening device. Law enforcement performed a preliminary field-test which resulted in a positive response for methamphetamine, and the weight of the methamphetamine purchased from MINNEHAN was approximately eight (8) grams.

D. Law enforcement seizure of methamphetamine in December 2020

14. In December 2020, in Arlington, Virginia, law enforcement conducted surveillance at SUSPECT RESIDENCE-1. Law enforcement had learned that this was an "Airbnb" rental property that was being rented by MINNEHAN. Law enforcement detained a subject—CS-2—during a traffic stop during which law enforcement seized a quantity of suspected methamphetamine after the subject was observed leaving SUSPECT RESIDENCE-1. Laboratory testing of the substance at the DEA Mid-Atlantic Laboratory confirmed that it had a net weight of 37.231 grams of which 36.846 grams were actual methamphetamine.

E. Historical information provided by CS-2

15. CS-2 agreed to cooperate with law enforcement and identified MINNEHAN as the

5

source of supply for the methamphetamine seized from CS-2 in December 2020. CS-2 told law enforcement that he arrived at MINNEHAN's residence several nights prior to the stop by law enforcement, and while staying with MINNEHAN he observed MINNEHAN with approximately ten (10) ounces of suspected methamphetamine. Further, CS-2 told law enforcement that MINNEHAN had directed CS-2 to deliver a wallet and the quantity of methamphetamine seized from CS-2 in December 2020 to a subject with the first named "Chris" in Prince William County, Virginia. While staying with MINNEHAN, CS-2 informed that he had made other similar deliveries of methamphetamine to other co-conspirators in Virginia on at least four (4) other occasions on behalf of MINNEHAN. CS-2 informed law enforcement that MINNEHAN supplied CS-2 with methamphetamine in exchange for CS-2 delivering quantities of methamphetamine to other individuals.

F. Communications between CS-2 and MINNEHAN

16. During the encounter with law enforcement in December 2020, CS-2 consented to a search of his cellular phone. This revealed communications corroborating CS-2's statements that he was communicating with MINNEHAN to distribute methamphetamine. CS-2 communicated with MINNEHAN on Threema, which is an encrypted phone messaging application. The following table identifies communications between CS-2 and MINNEHAN regarding the purchase of methamphetamine.

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 12/22/20 | MINNEHAN | Chris is enroute to grab his wallet |
| 12/22/20 | MINNEHAN | Hey |
| 12/22/20 | MINNEHAN | How close are you to Chris? |
| 12/22/20 | CS-2 | Not |

| 12/22/20 | MINNEHAN | He just called me |
| 12/22/20 | MINNEHAN | Wya? |
| 12/22/20 | MINNEHAN | What happened? |

17. Through my knowledge of this investigation and discussions with CS-2, I believe that during the above exchange, MINNEHAN advised CS-2 that "Chris" is going to meet CS-2 for the purpose of obtaining the previously discussed wallet and quantity of methamphetamine that was ultimately seized from CS-2 by law enforcement. This exchange occurred near the time of the law enforcement stop of CS-2, and in the exchange MINNEHAN is questioning CS-2's whereabouts. A wallet with the identification an individual with the first name of "Chris" was located during the stop of CS-2.

G. Historical Information provided by CS-3

18. In late 2019, a subject—CS-3—was arrested and agreed to plead guilty to federal drug trafficking charges in the Eastern District of Virginia. During interviews, CS-3 identified MINNEHAN as a distributor of crystal methamphetamine in the Eastern District of Virginia and elsewhere. CS-3 also was aware that MINNEHAN was traveling to Georgia to purchase large quantities of crystal methamphetamine for further distribution. CS-3 identified 202-534-7049 as a phone number being utilized by MINNEHAN.

H. Controlled Purchase of methamphetamine on January 7, 2021

18. On or about January 7, 2021, under the direction and supervision of law enforcement, CS-3 made a controlled purchase of a quantity of suspected methamphetamine from MINNEHAN in Arlington, Virginia, within the Eastern District of Virginia. Both before and after the controlled purchase, law enforcement searched CS-3 for contraband with negative results. Law

enforcement conducted surveillance of the arranged meeting location. CS-3 met with MINNEHAN inside of SUSPECT RESIDENCE-1 to conduct the transaction. According to CS-3, MINNEHAN provided him with the methamphetamine that he later provided to law enforcement. This controlled purchase was audio recorded, and I can confirm the recording corroborates CS-3's statements. Laboratory testing of the substance at the DEA Mid-Atlantic Laboratory confirmed that it had a net weight of 28.48 grams of which 23.35 grams were actual methamphetamine.

19. CS-3 provided law enforcement text messages that were exchanged through Threema where MINNEHAN arranged the January 7, 2021 transaction, which read as follows:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 01/06/21 | MINNEHAN | Give me a idea of what time it's going to be and then just confirm that day off |
| 01/06/21 | MINNEHAN | *day of |
| 01/06/21 | MINNEHAN | That way I can be sure to be somewhere accessible |
| 01/06/21 | CS-3 | Ok cool. Well I'll be working right by pentagon city mall. Gotta be at work around 12:30/1pm. Meeting around there somewhere would work? |
| 01/06/21 | CS-3 | Also how much you running me for an o…probably should have asked that earlier. Lol |
| 01/06/21 | MINNEHAN | 506 24th St S, Arlington |
| 01/06/21 | MINNEHAN | Is that close enough? |
| 01/06/21 | MINNEHAN | And $800 |
| 01/06/21 | CS-3 | Gotcha. Yeah that would be super. Ok cool |
| 01/06/21 | CS-3 | I'll hit you in the morning when I leave home |
| 01/06/21 | MINNEHAN | Ok |
| 01/06/21 | MINNEHAN | It's good too |
| 01/06/21 | MINNEHAN | Bottled at the source |
| 01/06/21 | MINNEHAN | None of that pesky cut to deal with |
| 01/06/21 | MINNEHAN | Just pure spring water |
| 01/06/21 | CS-3 | Well I'm sure they'll be pleased (smiley face). Don't really matter to me as I don't do that anymore. Just helping out a friend in need. |
| 01/06/21 | MINNEHAN | If u want bring me some acetone and I'll ensure you get a beautiful bag. It doesn't need the wash tho |
| 01/06/21 | MINNEHAN | We realize a 0%loss after drying/weighing |
| 01/06/21 | CS-3 | Nah I trust you. No wash needed. |

| 01/06/21 | CS-3 | I gotta be quick anyway. You're sweet to offer. |

20. Based on your affiant's training and experience and information provided by CS-3, during this exchange, MINNEHAN quotes a price of $800 for an ounce of methamphetamine. When CS-2 refers to an "o", this is known to be common drug slang for an ounce (28 grams). Also, your affiant knows from training and experience that acetone is commonly used by methamphetamine traffickers and users to "clean" adulterants from crystal methamphetamine.

I. <u>Controlled purchase of methamphetamine on March 12, 2021</u>

21. On or about March 12, 2021, under the direction and supervision of law enforcement, CS-3 made a controlled purchase of approximately two (2) ounces of suspected methamphetamine from MINNEHAN in Arlington, Virginia, within the Eastern District of Virginia. Both before and after the controlled purchase, law enforcement searched CS-3 for contraband with negative results. Law enforcement conducted surveillance of the arranged meeting location. CS-3 met with MINNEHAN inside of SUSPECT RESIDENCE-1 to conduct the transaction. According to CS-3, MINNEHAN provided him with the methamphetamine that he later provided to law enforcement. CS-3 stated that during the transaction, he observed approximately a half (1/2) pound of suspected methamphetamine in MINNEHAN's room along with a gun case. MINNEHAN told CS-3 that he had just purchased a new gun. This controlled purchase was audio recorded, and I can confirm the recording corroborates CS-3's statements. Laboratory testing of the substance at the DEA Mid-Atlantic Laboratory confirmed that it had a net weight of 56.64 grams of which 52.67 grams were actual methamphetamine.

J. <u>Subscriber records obtained from Sprint for phone number 202-534-7049</u>

21. Law enforcement obtained subscriber information from Sprint for 202-534-749, the phone number identified as being used by MINNEHAN. According to these records, this number

9

is subscribed to "Thomas MINNEHAN."

K.      Law enforcement seizure of methamphetamine on May 24, 2021

22.     During the week of May 16, 2021, CS-3 provided information that MINNEHAN was preparing to travel to Atlanta, Georgia to obtain a large quantity of crystal methamphetamine. CS-3 also informed law enforcement that MINNEHAN had moved from SUBJECT RESIDENCE-1 to 5840 Cameron Run Terrace #244, Alexandria, Virginia. Between May 21, 2021, and May 24, 2021, law enforcement monitored cell-site data and E-911 phase II data ("cell phone location data"), obtained via a state search warrant issued in Arlington, Virginia, for the cellular phone of MINNEHAN. On May 21, 2021 and May 22, 2021, the cell phone location data showed that the cell phone of MINNEHAN travelled from Northern Virginia to the Atlanta, Georgia area. On May 23, 2021 and May 24, 2021, the cell phone location data showed that the cell phone travelled from the Atlanta, Georgia area back to Northern Virginia.

23.     On May 24, 2021, in Fairfax County, Virginia, law enforcement executed a Fairfax County search warrant on a vehicle operated by MINNEHAN upon his return from the Atlanta, Georgia area. At the time of execution, MINNEHAN was the sole occupant of the vehicle. During the search, law enforcement seized approximately six (6) pounds of suspected crystal methamphetamine, digital scales and a Smith and Wesson handgun. Law enforcement performed a preliminary field-test on the suspected methamphetamine, which resulted in a positive response for methamphetamine.

24.     Following the stop, law enforcement executed a Fairfax County search warrant at MINNEHAN's residence located at 5840 Cameron Run Terrace #224, Alexandria, Virginia, located within the Eastern District of Virginia, which resulted in the seizure of approximately two (2) ounces of suspected crystal methamphetamine and three (3) additional handguns.

## **CONCLUSION**

25. Based upon the foregoing, I believe probable cause exists that from in and around 2019 to May 2021, within the Eastern District of Virginia and elsewhere, THOMAS JOSEPH MINNEHAN did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to unlawfully, knowingly, and intentionally distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 846.

_____
Tre' M. Smith
Special Agent
Drug Enforcement Administration

Subscribed and sworn to by the applicant in accordance with Fed. R. Crim. Proc. 4.1 by telephone on the\_\_\_\_\_ day of August, 2021.

_____ The Honorable John F. Anderson
United States Magistrate Judge